GAIDRY, J.
|2A former employee of a truck stop casino and her husband appeal a summary judgment dismissing their claims for damages for defamation and malicious prosecution against her former employer and its insurer. For the following reasons, we affirm the summary judgment.
FACTUAL BACKGROUND AND PROCEDURAL HISTORY
The plaintiff,[1] Debra A, Grow, was employed as a casino manager or supervisor *1027 from September 2001 until November 1, 2002 by Jalou II, Inc. (Jalou II), which operated the Houma Truck Stop and Casino in Houma, Louisiana. The business operations at that location included a convenience store, restaurant, and video poker casino. Ms. Grow was hired and trained for her position by the location’s general manager, Sandra L. Liner.
The casino at the Houma Truck Stop and Casino had approximately 50 video poker machines. As casino manager, Ms. Grow had the primary responsibility for the “drops,” or retrievals of cash, from each video poker machine. The drops were conducted twice a week on Monday and Thursday, and a courier service would transport the cash to be deposited in the bank on the same days. Jalou II had detailed written procedures describing the casino manager’s duties related to each step to be followed in the “drop” procedure, counting the retrieved cash, preparing “drop reports,” and maintaining a specified cash balance in the casino safe.
Near the end of May 2002, Ms. Liner, the general manager, instructed Ms. Grow to delay making a regular delivery of cash for deposit with the courier. Ms. Grow complied with Ms. Liner’s request, despite her |sknowledge that the delay violated Jalou II’s written procedures requiring regular scheduled deposits. It thereafter became an established practice, initiated at Ms. Liner’s direction, for Ms. Grow to delay the regular deposits until the next regularly-scheduled deposit date, or even later. The practice continued on an uninterrupted basis until October 31, 2002, when Jalou II’s management discovered its existence.
The treasurer of the Louisiana division of Jalou II’s parent corporation had conducted an initial internal audit of the Hou-ma Truck Stop and Casino that revealed chronic cash shortages and an ongoing pattern of delayed deposits from both the convenience store and casino operations, suggestive of a cash “kiting” or “lapping” scheme.[2] On October 31, 2002, the treasurer reported his initial findings to Thomas E. Hamilton, the vice-president of finance of Jalou II’s parent corporation, Colonial Management.
On the morning of November 1, 2002, Rick Gottardi, a vice-president of Jalou II, reported the theft of $210,014.69 to the Houma Police Department. Officer Lawrence Arceneaux was dispatched to the Houma Truck Stop and Casino, where he interviewed Mr. Gottardi and two other managerial employees of Jalou II. According to his initial written report, Officer Arceneaux was advised that approximately $87,836.69 had been “stolen” from the con *1028 venience store operation and that approximately |4$122,178.00 had been “taken” from the casino operation. Jalou II’s managerial employees also advised Officer Arcen-eaux that the “possible suspects in the theft” were Ms. Liner and Ms. Grow, the two employees with access to the convenience store and casino cash receipts. After Officer Arceneaux completed his initial investigation, the investigation was transferred to the police department’s detective bureau.
Detectives Kyle Faulk and Cory Johnson were assigned to conduct the investigation of the reported theft and went to the Houma Truck Stop and Casino later that morning. According to Detective Faulk’s written report, dated November 19, 2002, Mr. Gottardi and another managerial employee of Jalou II advised Detective Faulk that Ms. Liner and Ms. Grow were “the two subjects that handled the money responsible [sic ] for the deposits.” He was also provided a copy of the initial audit showing an approximate figure of $210,014.69 missing.
Ms. Liner and Ms. Grow were both questioned on November 1, 2002. Ms. Liner initially denied any involvement in the misappropriation of the missing funds and denied having a gambling problem after being questioned by Detective Faulk regarding gambling “stubs,” casino cards, and unexplained large bank deposit and withdrawal receipts found in her purse. Ms. Grow was also interviewed by Detective Faulk, and advised him that she had no knowledge of any missing funds and denied involvement in any theft of funds. She did admit to “holding] back” deposits at Ms. Liner’s direction, and further admitted that the practice was not “normal” and was “wrong to do.”
During the course of her questioning, Ms. Liner eventually confessed to having taken “approximately $50,000 to $80,000 in cash,” and later that day signed a written statement in which she stated:
lsLast fall I had a shortage in the safe and I took money from the bank deposit to replace it. After that I took money out of the bank deposits, five or six hunderd [sic ] dollars at a time. It just became a habit, I have a gambling habit. I didn’t go out and buy a bunch of stuff with it. I gambled locally and I went to Mississippi a few times. The amount of money that I took may be seventy[-]five or eighty thousand and I’m not sure about that[;] it could be more or less. I didn’t see anyone else take money.
At the time Ms. Liner was providing her written statement to Detective Faulk, Detective Johnson Was obtaining a written statement from Ms. Grow. The statement, signed and initialed by Ms. Grow, read as follows:
I have been working for [the] Casino for approximately 13 months. I was employed as the casino manager. I was to supervise the employees and to take care of all the money matters from that business. Sandra Liner was my supervisor during that time.
For the past few months, the safe was short. Sandra would tell me to hold the deposits from the video poker machines back and make deposits at another time. For example, I would make a “drop” of the video poker machines and Sandra would have me hold that deposit until Thursday or the following Monday. Monday and Thursday are the days of the week that the “drop” is made from the video poker machines. The safe was supposed to hold $200,000.00.
Sandra trained me for the manager’s job. At first, I would make the deposit on the day that the “drop” was made and it would be given to the bank courier. For the past few months, I have given the courier a deposit that was *1029 days to about a week late. This was done per Sandra’s request.
I have no knowledge that Sandra was taking any money from the casino. I have not taken any money from the store or the casino. I also have no knowledge of anyone else taking any money from the store or the casino.
I do recall a time where Sandra took $25,000.00 from the casino safe and said she was depositing it into another casino’s account. This occurred towards the end of September or beginning of October of this year. She did bring back a deposit slip for the money.
A few months ago, Sandra told me that she had to take $20,000.00 or $25,000.00 out of the safe to deposit it in the ATM account. She said the account was overdrawn and she 16had to put money back into it to cover some checks that [were] outstanding. I never seen [sic ] the deposit slip for that money.
Ms. Crow’s employment with Jalou II was terminated on November 1, 2002, following a telephone conversation between her and Mr. Gottardi. Her written separation notice provided that she was discharged for “Not Following Proper Procedure Resulting in Lost Money, [sic ]”
Ms. Liner was arrested on November 4, 2002, and charged with felony theft. The police investigation of the theft continued, and on November 6, 2002, Detective Faulk received further information from a Jalou II representative that the amount determined to be missing as of that time was approximately $226,231.87. On November 13, 2002, on the advice of counsel, Ms. Grow voluntarily appeared at the Houma City Police headquarters, where she was arrested by Detective Faulk and charged with one count of felony theft (theft over $500.00) under La. R.S. 14:67.
On December 15, 2002, Mr. Hamilton sent a detailed memorandum to the insurance agency that underwrote Jalou II’s commercial crime policy, issued by Fidelity and Deposit Company of Maryland (Fidelity). In that memorandum, Mr. Hamilton set forth Jalou II’s customary procedures relating to the daily accounting procedures for the casino, convenience store, and restaurant, the video poker machine “drops,” cash held in the casino safe, and scheduled bank deposits. He also described the final findings of the internal audit. According to the audit, two methods were used to accomplish the theft of the missing funds: (1) the “kiting” of the regularly-scheduled deposits, and (2) direct theft from the casino safe. Examination of the daily accounting reports were compared with the deposit records, confirming substantial time lags in making the regular deposits for both the convenience store and the casino revenues. The “kiting” of the convenience 17store deposits began in March 2001, while the “kiting” of the casino deposits began around the end of May 2002. Some deposits from the video poker machine “drops” were documented as being ten to fifteen days late.[3] The actual total amount taken was determined to be $261,945.71, consisting of $72,012.96 from the convenience store deposits, $154,932.75 from the casino deposits, and $35,000.00 cash from the casino safe line item account for “ATM [automatic teller machine] loads.”
On September 5, 2003, Jalou II and Fidelity filed a joint petition seeking recovery of the missing funds from Ms. Liner and Ms. Grow. It was alleged that the total loss was in the amount of $261,954.71 and was “a result of the actions of the defen *1030 dants, Sandra L. Liner and Debbie [sic ] A. Grow.”
On September 24, 2003, Ms. Liner filed an answer in the form of a general denial of the petition’s allegations. Ms. Grow filed her answer on November 25, 2003, generally denying the petition’s allegations and her liability, and farther specially pleading “the affirmative defensefs] of error and mistake and contributory negligence.”
On January 5, 2004, the Terrebonne Parish district attorney moved to nolle prosequi the charge of felony theft against Ms. Grow on the grounds of “insufficient evidence,” based upon the “current investigations by law enforcement.”
On August 30, 2004, Ms. Grow and her husband, Randy Grow (plaintiffs), filed a reconventional demand against Jalou II and Fidelity, alleging that the allegations resulting in her arrest were made without probable cause and with malice, the criminal charges against her were nolle prose-quied, and that the defendants were liable to them for damages for | ^malicious prosecution. Plaintiffs also alleged that they were defamed by allegations in the defendants’ civil petition that Ms. Grow “stole or caused to be stolen” the amount of the missing funds claimed, and that the defendants’ malicious prosecution and defamation caused her stress that aggravated her diabetes and kidney disease.
On October 21, 2004, Fidelity filed its answer to plaintiffs’ reconventional demand, generally denying its allegations and incorporating a peremptory exception of no cause of action.
Jalou II’s answer to plaintiffs’ reconven-tional demand was filed on December 21, 2004. In its answer, it admitted that its petition in the principal action alleged that the loss claimed resulted from the actions of both Ms. Liner and Ms. Grow, and that the criminal charges against Ms. Grow were nolle prosequied, but otherwise denied all of plaintiffs’ other substantive allegations. Jalou II specifically denied that it ever made a false or defamatory statement regarding plaintiffs, that there was any unprivileged communication to a third party, and that any statement it did make was malicious or negligent. Finally, it included a dilatory exception of prematurity as to plaintiffs’ cause of action for defamation.
On December 1, 2008, Jalou II filed a motion for summary judgment, together with a supporting memorandum and exhibits, contending that it was entitled as a matter of law to judgment dismissing plaintiffs’ causes of action for both malicious prosecution and defamation.[4] Fidelity filed a similar motion for summary judgment on December 10, 2008.
| ¡¡Both motions for summary judgment were originally fixed for hearing on January 30, 2009. On motion of plaintiff Debra A. Grow, the hearing on the motions was continued to March 27, 2009. Jalou II subsequently moved to continue the hearing again, and the hearing was re-fixed for May 1, 2009. At the conclusion of the hearing, the trial court took the matter under advisement for decision, granting the parties leave to file post-hearing mem-oranda.
The trial court rendered and signed its judgment on the motions on May 28, 2009, granting summary judgment in favor of both defendants and dismissing plaintiffs’ reconventional demand with prejudice. Plaintiffs then moved to amend the sum *1031 mary judgment to certify it as a final judgment for purposes of appeal. On July 10, 2009, the trial court signed an ex parte “order” granting the motion to amend the judgment and certifying it as final. An amended judgment, again granting both motions and certifying the judgment as a final judgment, was signed on July 24, 2009.[5] On the same date, plaintiffs filed a motion for a devolutive appeal.
ASSIGNMENTS OF ERROR
Plaintiffs contend that the trial court erred in (1) granting the defendants’ motions for summary judgment and dismissing plaintiffs’ reconventional demand for defamation and malicious prosecution; and (2) allowing the defendants to assert the defense of conditional or qualified | ^privilege in their motions for summary judgment when they did not plead it as an affirmative defense in their answers to the reconventional demand.
DISCUSSION
As later clarified by plaintiffs, their claims for defamation and malicious prosecution for statements contributing to the criminal investigation and arrest of Ms. Grow are directed against Jalou II only. Their claims for defamation for the allegations of the civil petition filed by Fidelity and Jalou II are directed against both of those defendants.

Summary Judgment

Summary judgment is subject to de novo review on appeal, using the same standards applicable to the trial court’s determination of the issues. Peak Performance Physical Therapy & Fitness, LLC v. Hibernia Corp., 07-2206, p. 5 (La.App. 1st Cir.6/6/08), 992 So.2d 527, 530, writ denied, 08-1478 (La.10/3/08), 992 So.2d 1018. The summary judgment procedure is expressly favored in the law, and is designed to secure the just, speedy, and inexpensive determination of non-domestic civil actions. La. C.C.P. art. 966(A)(2). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, admissions, and affidavits in the record show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B).
The mover has the burden of proof that he is entitled to summary judgment. See La. C.C.P. art. 966(C)(2). If the mover will not bear the burden of proof at trial on the subject matter of the motion, he need only demonstrate the absence of factual support for one or more essential elements of his opponent’s claim, action, or defense. La. C.C.P. art. 966(C)(2). If the moving party points out that there is an absence of factual support for one or more elements essential to the adverse party’s claim, |naction, or defense, then the nonmoving party must produce factual support sufficient to satisfy his evidentiary burden at trial. La. C.C.P. art. 966(C)(2). If the mover has put forth supporting proof through affidavits or otherwise, the adverse party may not rest on the mere *1032 allegations or denials of his pleading, but his response, by affidavits or otherwise, must set forth specific facts showing that there is a genuine issue for trial. La. C.C.P. art. 967(B).
Because of their chilling effect on the exercise of freedom of speech, defamation actions have been found particularly susceptible to summary judgment. Kennedy v. Sheriff of E. Baton Rouge, 05-1418, p. 25 (La.7/10/06), 935 So.2d 669, 686. Summary judgment, being favored in the law, is a useful procedural tool and an effective screening device to eliminate un-meritorious defamation actions that threaten the exercise of First Amendment rights. Id.

The Alleged Defamation and Malicious Prosecution in Reporting the Suspected Theft

Plaintiffs contend that Ms. Grow was defamed by Jalou II’s communications to the police reporting the theft of its funds. The particular statements forming the basis of that alleged defamation were allegedly documented in police investigative reports, previously described above. As described by plaintiffs, the particular statements by Jalou II’s representatives reported a large “theft,” in which an amount was “stolen” from the convenience store operation and an additional amount “taken” from the casino operation, and identifying “the possible suspects in the theft” as Ms. Liner and Ms. Grow.

The Alleged Defamation in Defendants’ Petition

In their petition in the principal action, Jalou II and Fidelity alleged that Fidelity issued a “Commercial Crime Policy” to Jalou II, and that “[t]he Impolicy protected the insured from loss resulting from the dishonesty of its employees as defined in the policy.” They alleged that Jalou II “sustained a loss of $261,945.71 through the acts of defendants, Sandra L. Liner and Debbie [sic ] A. Grow,” and that Jalou II submitted proof of its loss under Fidelity’s policy. They further alleged that after investigating Jalou II’s claim, Fidelity determined that the loss had been sustained and was covered under the policy, and accordingly paid its policy limits of $150,000.00 to Jalou II “[a]s a direct result of the conduct of defendants, Sandra L. Liner and Debbie [sic ] A. Grow.”
Attached as exhibits[6] to the petition were copies of the declarations page and various endorsements of Fidelity’s policy, confirming coverage for “employee theft” with a limit of $150,000.00 per occurrence and a deductible amount of $2,500.00 per occurrence.[7] Another exhibit was a sworn “Fidelity Proof of Loss Form” executed by Mr. Hamilton, the vice-president of finance of Jalou II’s parent corporation, attesting to its loss claimed under the policy. The form stated that Jalou II was presenting a claim for loss under Fidelity’s policy “related to Claimant’s former employee(s), Sandra Liner [and] Debbie [sic ] Grow, ... employed in the positions] of general manager [and] casino manager ..., said loss being discovered on the date of [October 31, 2002].” The form also required a description of the “loss items” upon which “the Claimant’s loss and all sums due and owing because of Claimant’s above named employees” were based. The “loss items” were described as “cash from bankrolls at location,” in the amount of $261,945.71. Mr. Hamilton also executed a sworn verification at |isthe bottom of the form “that *1033 the Claimant’s former employee(s) named herein did convert or cause to be converted, misappropriated or otherwise caused a covered loss equal to the amount of claim herein indicated in this statement.”
Finally, another exhibit to the petition was a notarized “Release and Assignment” executed by Mr. Hamilton on behalf of Jalou II in favor of Fidelity, by which Jalou II acknowledged satisfaction of its claim under the policy and Fidelity’s sub-rogation to its right to pursue recovery of the sum paid under the policy. That document also described the proof of loss submitted by Jalou II as “alleging that through the acts of employee dishonesty by the Insured’s employees, Sandra Liner and Debbie [sic ] Grow ..., Insured has sustained a net loss of $261,945.71[.]”

The Affirmative Defense of Conditional or Qualified Privilege

In Louisiana, privilege relating to a communication is a defense to a defamation action. Kennedy, 05-1418 at p. 16, 935 So.2d at 681. The defense is founded upon the principle that as a matter of public policy, in order to encourage the free communication of views in certain defined instances, a person is sometimes justified in communicating defamatory information to others without incurring liability. Id., citing Toomer v. Breaux, 146 So.2d 723, 725 (La.App. 3rd Cir.1962).
Privileged communications may be either (1) absolute (such as statements by judges in judicial proceedings or legislators in legislative proceedings) or (2) conditional, or qualified. Kennedy, 05-1418 at p. 16, 935 So.2d at 681. The basic elements of a conditional privilege are (1) good faith; (2) an interest to be upheld; (3) a statement limited in scope to that interest; (4) a proper occasion for the communication of the statement; and 114(5) publication in a proper manner and to proper parties only. Id., citing Madison v. Bolton, 234 La. 997, 102 So.2d 433, 439 n. 7 (La.1958).
The analysis of whether a conditional privilege exists is a two-step process. Kennedy, 05-1418 at pp. 17-18, 935 So.2d at 682. First, it must be determined as a matter of law whether the circumstances in which a communication was made satisfy the legal requirements for invoking the conditional privilege. Smith v. Our Lady of the Lake Hosp., 93-2512, p. 18 (La.7/5/94), 639 So.2d 730, 745. The second step requires a determination of whether the privilege was abused, which requires a factual determination that malice or lack of good faith existed. Id.
Conditional privilege is an affirmative defense to a cause of action for defamation that must be affirmatively or specially pleaded in a defendant’s answer. See Costello v. Hardy, 03-1146, p. 16 n. 13 (La.1/21/04), 864 So.2d 129, 142 n. 13, and La. C.C.P. art. 1005. In their second assignment of error, plaintiffs contend that Jalou II and Fidelity did not affirmatively plead the defense of conditional or qualified privilege in their answers to plaintiffs’ reconventional demand, and that the trial court was therefore precluded from considering that issue for purposes of summary judgment. We address this assignment of error first, as the determination of that procedural issue will substantially affect our determination of the first and primary assignment of error relating to the merits of the summary judgment.
In its answer to plaintiffs’ recon-ventional demand, filed on December 21, 2004, Jalou II denied plaintiffs’ allegations that it defamed her. After responding to the allegations of each paragraph of the reconventional demand, it set forth the following allegations in an additional paragraph of its answer:
*1034 | isThis defendant specifically denies that it ever made a false or defamatory statement regarding the [plaintiffs]. It further denies that there was any unprivileged publication to a third party. Nor was there any maliciousness or negligence in any statement that it did make regarding [plaintiffs].
(Emphasis added.)
On its face and in the context of the other sentences, the emphasized sentence raised the issue of the privileged nature of any statement Jalou II made and published to a third party. By denying that any statement it did make to a third person was “unprivileged,” Jalou II in effect alleged that any such statement was privileged. We conclude that such allegation is adequate for purposes of pleading the affirmative defense of conditional privilege and gave plaintiffs fair notice of that defense. See Paxton v. Ballard, 289 So.2d 85, 86-88 (La.1974), and La. C.C.P. arts. 865 and 5051. Thus, plaintiffs had notice that the affirmative defense of conditional privilege had been placed at issue by Jalou II almost four years prior to the filing of defendants’ joint motion for summary judgment.
In addition to the affirmative allegation in its answer, Jalou II again expressly and specifically invoked the defense of conditional privilege in its motion for summary judgment. In a separate addendum attached to its motion, Jalou II listed the material facts that it contended were undisputed, including the following:
2. There is no material issue of fact that at any time did [defendants] ever utter a defamatory statement or unprivileged communication, to a third party;
[[Image here]]
5. There is no factual support sufficient to establish that [plaintiffs] will be able to satisfy [their] evidentiary burden of proof at trial in that [they are] unable to show that Jalou II’s report to police was not a “qualified privilege” or that the report was made in “bad faith” or with “malice,” essential elements of recovery.
| mIn its answer to plaintiffs’ recon-ventional demand, Fidelity did not assert an affirmative allegation raising the defense of privilege. It did, however, incorporate a peremptory exception of no cause of action in its answer, and it later filed its own motion for summary judgment, adopting by reference the allegations of Jalou II’s motion and the argument of its supporting memorandum, both of which specifically addressed the defense of conditional privilege.
By definition, an affirmative defense raises a new matter or issue that will defeat the plaintiffs claim on the merits, even assuming that claim is valid and that the allegations of the petition are true. See Webster v. Rushing, 316 So.2d 111, 114 (La.1975); Fishbein v. State ex rel. LSU Health Sciences Ctr., 06-0549, p. 6 (La.App. 1st Cir.3/9/07), 960 So.2d 67, 71-2, writs denied, 07-0730 (La.6/22/07), 959 So.2d 495, and 07-0708 (La.6/22/07), 959 So.2d 505.[8] Implicit in that definition is the conclusion that a defendant is not required to raise an issue as an affirmative defense if it does not raise a “new matter.” Fishbein, 06-0549 at p. 6, 960 So.2d at 72. The purpose of pleading a special defense is to give fair and adequate notice of the nature of the defense so that the plaintiff is not surprised. Webster, 316 So.2d at 114.
*1035 It is particularly significant here that the defamation alleged to have been committed by the defendants occurred in the context of their reporting suspected criminal activity and pursuit of a civil remedy for recovery of their losses attributable to such activity, and that such context is self-evident from the allegations of plaintiffs’ own petition. In the Kennedy case, which thoroughly discussed the legal grounds, constitutional implications, and |17social utility of the conditional privilege, the supreme court expressly noted that the allegations of the plaintiffs petition itself confirmed the circumstances giving rise to the privilege. Kennedy, 05-1418 at p. 27 n. 18, 935 So.2d at 687 n. 18.[9]
Similarly, as emphasized by Fidelity in the trial court and on appeal, it has been held that if the existence of an affirmative defense is apparent on the face of the factual allegations of the petition, a court may properly consider such a defense at issue for the purpose of determining its applicability, even on summary judgment. See Rogers v. Ash Grove Cement Co., 34,-934, p. 6 (La.App. 2nd Cir.11/2/01), 799 So.2d 841, 846, writ denied, 01-3187 (La.2/8/02), 808 So.2d 351, and Vincent v. Miller, 03-0759, p. 2 (La.App. 3rd Cir.2/4/04), 867 So.2d 780, 783. Under such circumstances, the affirmative defense has in effect been placed at issue by the plaintiff himself, and it would be unduly technical and pedantic to insist upon rigid adherence to the requirement that the defense be specially pleaded in an answer when it is clear that the defendant has in fact asserted the defense.[10]
Louisiana Code of Civil Procedure article 1154 provides:
When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleading. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure to so amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, l18the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be sub-served thereby, and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense on the merits. The court may grant a continuance to enable the objecting party to meet such evidence.
A trial court has great discretion to admit or to disallow evidence subject to an objection based upon the scope of the issues and pleadings and to determine whether evidence is encompassed by the general issues raised by the pleadings. Barabay Prop. Holding Corp. v. Boh Bros. Constr. Co., L.L.C., 07-2005, p. 5 (La.App. 1st Cir.5/2/08), 991 So.2d 74, 78, writ granted, 08-1185 (La.10/10/08), 993 So.2d 1270, writ denied as improvidently granted, 08-1185 (La.3/17/09), 6 So.3d 172. It *1036 has likewise been generally recognized that a trial court has much discretion under La. C.C.P. art. 1154 to allow a party to amend his pleadings. Id.
At the hearing of May 1, 2009, Jalou II’s counsel argued that the affirmative defense of conditional privilege was, at a minimum, “implied” in its pleadings, and that even if it were not, the defendants could still seek to amend their answers to plead the defense, given the case’s procedural posture. On that point, plaintiffs’ counsel responded that the deposition of Mr. Hamilton was never taken because the defense of conditional privilege was never pleaded. In their post-hearing memorandum to the trial court, plaintiffs similarly argued that they “would have the right to object to leave being granted to [defendants] to amend their answers due to the large amount of time that has passed” and that if leave were granted, “it would only be fair to allow Grow time to do discovery and take depositions on the issue of good faith.” Significantly, however, plaintiffs never moved to strike or exclude the defense, and did not move for another continuance of the | ^hearing pursuant to either La. C.C.P. arts. 1154 or 967(C).[11] More importantly, in light of the fact that plaintiffs were indisputably aware that both defendants were in fact asserting that affirmative defense by December 10, 2008 at the latest (when Fidelity filed its motion adopting that of Jalou II, well over four months prior to the hearing), they cannot be said to have been surprised or prejudiced as to that issue, and plaintiffs clearly had ample opportunity to conduct further discovery and to submit opposing affidavits in the interim between the filing of the defendants’ motions and the hearing.
In granting defendants’ motions, the trial court did not expressly rule on the issue of the enlargement or amendment of the pleadings under La. C.C.P. art. 1154, but by implication it obviously permitted the enlargement and treated the issue of conditional privilege as having been raised. See Robinson v. Benson Motor Co. of New Orleans, 98-203, p. 5 (La.App. 5th Cir.8/25/98), 717 So.2d 1252, 1254, and Grant v. Boh Bros. Constr. Co., Inc., 00-1227, p. 3 (La.App. 4th Cir.4/25/01), 785 So.2d 1041, 1043. In light of all the foregoing considerations, we conclude that the trial court did not abuse its discretion or otherwise err in implicitly permitting enlargement or amendment of Fidelity’s answer and in considering the issue of conditional privilege. Accordingly, plaintiffs’ second assignment of error |2nhas no merit, and all issues bearing upon the merits of the summary judgment are properly before us.[12]

Was Summary Judgment Appropriate?

Words that convey an element of personal disgrace, dishonesty, or disrepute are defamatory. Costello, 03-1146 at p. 13, 864 So.2d at 140. The question of whether the words convey a particular meaning that is defamatory is ultimately a legal question. Id. Four elements are necessary to establish a claim for defamation: (1) a false and defamatory statement *1037 concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury. Kennedy, 05-1418 at p. 4, 935 So.2d at 674. (Emphasis added.) The element of fault is generally referred to in the jurisprudence as malice, actual or implied. Costello, 03-1146 at p. 14, 864 So.2d at 140. If even one of those elements is found lacking, the cause of action fails. Kennedy, 05-1418 at p. 16, 935 So.2d at 681.
In Louisiana, defamatory words have been classified as either words that are defamatory per se or words susceptible of a defamatory meaning. Costello, 03-1146 at p. 13, 864 So.2d at 140. Words that expressly or implicitly accuse another of criminal conduct, or that by their very nature tend to injure one’s personal or professional reputation, even without considering extrinsic facts or surrounding ch’cumstances, are considered defamatory per se. Id., 03-1146 at pp. 13-14, 864 So.2d at 140. When a plaintiff proves publication of words that are defamatory per se, the elements of falsity and malice (or fault) are presumed, but may be rebutted by the defendant. Id., 03-1146 at p. 14, 864 So.2d at 140. When the words E,are not defamatory per se, a plaintiff must prove, in addition to defamatory meaning and publication, the elements of falsity, malice (or fault), and injury. Id.
A good faith report to law enforcement officers of suspected criminal activity may appropriately be characterized as speech on a matter of public concern. Kennedy, 05-1418 at p. 9, 935 So.2d at 677. Louisiana courts have recognized that the public has an interest in possible criminal activity being brought to the attention of the proper authorities, and have extended a conditional privilege to reports made in good faith. Id., 05-1418 at p. 19, 935 So.2d at 683. The conditional privilege is abused if the publisher (a) knows the matter to be false, or (b) acts in reckless disregard as to its truth or falsity. Id., 05-1418 at p. 22, 935 So.2d at 684.
Plaintiffs emphasize that Jalou II never questioned Ms. Grow about the findings of the audit or the facts underlying her delays in making deposits prior to contacting the police or prior to filing the civil petition with Fidelity, and that the defendants’ malice, i.e., negligence or reckless disregard for the truth, should therefore be presumed. They further argue for the same reason that genuine issue of material fact therefore exists as to the issues of the defendants’ malice and their good faith required to assert the conditional privilege.
In a case involving a private individual allegedly injured by a defamatory statement in a matter of public concern, the applicable standard of fault, or malice, is the following:
One who publishes a false and defamatory communication concerning a private person ... is subject to liability, if, but only if, he
(a) knows that the statement is false and that it defames the other,
122(b) acts in reckless disregard of these matters, or
(c) acts negligently in failing to ascertain them.
Kennedy, 05-1418 at p. 15, 935 So.2d at 681, citing Restatement (Second) of Torts § 580B.
To establish reckless disregard of the truth, a plaintiff must prove that the publication was deliberately falsified, published despite the defendant’s awareness of probable falsity, or the defendant in fact entertained serious doubts as to the truth of his publication. Kennedy, 05-1418 at pp. 28-9, 935 So.2d at 688. Even proof of gross negligence in the publication of a *1038 false statement is insufficient to prove reckless disregard under this standard. Id., 05-1418 at p. 29, 935 So.2d at 688. Mere negligence in determining the falsity of a statement (or lack of reasonable grounds for believing it to be true) is insufficient to prove abuse of the conditional privilege for communication of alleged wrongful acts to an official authorized to protect the public from such acts. Id., 05-1418 at p. 22, 935 So.2d at 684.
Louisiana Code of Civil Procedure article 966(B) provides that summary judgment is appropriately rendered “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law.” Louisiana Code of Civil Procedure article 967(A) provides that “[sjupporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.”
Jalou II filed the affidavit of Mr. Hamilton in support of its motion for summary judgment. In his affidavit, Mr. Hamilton attested that at the time of the relevant events at issue, he was the vice-president of finance for Jalou | ⅝.11⅛ parent corporation, and “ultimately responsible for the supervision of all financial transactions in connection with Jalou II.” He testified that on October 31, 2002, he was informed by Jalou II’s treasurer of the loss of funds from the casino and convenience store deposits for the Houma Truck Stop and Casino. He was also advised by the treasurer that the two employees responsible for the video poker machine “drops” and the bank deposits were Ms. Liner and Ms. Grow, and that because they were the only employees in charge of the safe and the deposits, “there was a strong suspicion that they may have been involved in the defalcation.”
Mr. Hamilton further attested that “[a] couple of months later, after a full investigation and internal audit was conducted,” he spoke with Captain John Hogenstadt of the Houma Police Department and provided him with the result of that internal audit, suggestive of a “kiting scheme” utilizing “late bank deposits,” resulting in a loss of $261,945.71. Mr. Hamilton testified that when he informed Captain Hogen-stadt of the foregoing, “[he] did not accuse Debra Grow of theft or misappropriation but simply reported the loss and the supporting documentation to him.” Although he acknowledged that his statements to the police and to Fidelity attributed the financial losses to the actions of both Ms. Liner and Ms. Grow, Mr. Hamilton emphasized that at no time did he make any “defamatory comments,” “false accusations,” “disparaging comments,” or “false statements that [he] knew to be untrue” about Ms. Grow. Finally, he affirmed that he “never possessed any malice or hatred toward Debra Grow.”
In his affidavit, Detective Faulk described the initiation of the criminal complaint and his interviews with representatives of Jalou II and Ms. Grow. Detective Faulk unequivocally confirmed that “[a]t no time did . \-M. . any representative of Houma Truck Plaza [sic ] accuse Ms. Grow of committing a theft,” that Jalou II’s representatives simply provided information that its internal audit showed missing or unaccounted funds from the casino, and that Ms. Liner and Ms. Grow were “the two people responsible for the deposits of the casino funds.” Even if Jalou II representatives described Ms. Grow to the police as a “possible suspect in the theft” and both defendants obliquely alleged that she committed “acts of employee dishonesty” *1039 in the release form attached to the civil petition, and even if it is assumed that such statements were defamatory per se, they were clearly privileged under the circumstances.
The pleadings, admissions, affidavits, Ms. Grow’s deposition, and other evidence in the record show that it is undisputed that the theft or conversion of the missing funds occurred, that the practice of delayed deposits served to conceal the theft, and that the ongoing “kiting” or “lapping” scheme was facilitated by Ms. Grow’s acquiescence, whether knowing or negligent, to Ms. Liner’s directives. Plaintiffs presented no affidavits in opposition to those of Detective Faulk and Mr. Hamilton. In her deposition, Ms. Grow admitted that she had no personal knowledge that any employee, agent, or other representative of Jalou II advised the police that she personally stole from Jalou II. She further acknowledged that her claim of defamation related to the criminal charge was based solely upon the fact that she was arrested after the police were advised only that she was one of the two employees responsible for handling the missing funds.
In Costello v. Hardy, the Louisiana supreme court adopted a negligence standard of liability in defamation actions by private individuals involving matters of private concern. Costello, 03-1146 at pp. 18-19, 864 So.2d at 143. In Kennedy, as previously noted, the same standard was 12„adopted for actions by private individuals in matters of public concern. Kennedy, 05-1418 at p. 14, 935 So.2d at 680. Thus, in this case, the same general legal principles applicable to the alleged defamation related to the criminal action apply to the alleged defamation in the civil action instituted by the defendants. In cases of defamation alleged to arise from statements made in pleadings or otherwise in the course of a judicial proceeding, the conditional privilege operates to protect “minimally offensive allegations necessary to state a cause of action.” See Costello, 03-1146 at p. 16 n. 13, 864 So.2d at 142 n. 13. As the supreme court has observed on a number of occasions, “[l]itigants must be free to allege facts constituting inappropriate conduct if there is any reasonable basis for such allegations and the misconduct is relevant to the proceeding.” Id., citing Freeman v. Cooper, 414 So.2d 355, 359 (La.1982).
The allegations of the defendants’ civil petition (incorporating the attached proof of loss and release forms) plainly can be read as supporting a legally cognizable cause of action against Ms. Grow for negligently facilitating and contributing to Ms. Liner’s misappropriation of the missing funds, particularly when viewed in light of her undisputed knowledge of the irregularity of the delayed deposits, their violation of established company policy and procedures, and her admitted failure over an extended period of time to report Ms. Liner’s violations to management. In light of the undisputed facts in the record, the defendants have adequately rebutted plaintiffs’ conclusory allegations of bad faith, malice, and abuse of the privilege applicable to allegations in judicial proceedings, and we conclude that the privileged allegations of the defendants’ civil petition are not defamatory as a matter of law.
12fiWith regard to the claim against Jalou II for malicious prosecution, our prior observations regarding the lack of proof as to the element of malice or negligence are applicable with equal force. Malicious prosecution actions have never been favored in our law, and the plaintiff in such an action must clearly establish that the forms of justice have been perverted to the gratification of private malice and the willful oppression of the innocent. *1040 Johnson v. Pearce, 813 So.2d 812, 816 (La.1975). An action for malicious prosecution of a criminal proceeding, such as that asserted by plaintiffs here, requires the following elements: (1) the commencement or continuance of an original criminal proceeding; (2) its legal causation by the present defendant against the plaintiff, who was the defendant in the criminal proceeding; (8) the bona fide termination of the criminal proceeding in favor of the present plaintiff; (4) the absence of probable cause for the criminal proceeding; (5) malice; and (6) damage to the plaintiff, conforming to legal standards. Miller v. E. Baton Rouge Parish Sheriff's Dep’t, 511 So.2d 446, 452 (La.1987).
In a malicious prosecution action, there must be malice in fact. Id., 511 So.2d at 453. Any feeling of hatred, animosity, or ill will toward the plaintiff, of course, amounts to malice. Id. But malice is also found when the defendant uses the prosecution for the purpose of obtaining any private advantage (as, for example, a means to extort money, to collect a debt, or to intimidate witnesses in another action). Id. Malice may also be inferred from lack of probable cause or a finding of reckless disregard for the other person’s rights. Id.
In his affidavit, Detective Faulk testified that after being supplied the initial information regarding the missing funds from the audit and the identity of the employees responsible for managing and depositing the funds, |27he and Detective Johnson conducted additional investigation. He confirmed that Ms. Grow advised him that she knew it was “wrong” to “hold back the deposits.” Finally, he verified that he made the decision to arrest Ms. Grow “[b]ased upon the information gathered, [his] investigation and the statement given to [him] by Debra Grow.” Here, the defendant’s employees merely reported their suspicions to law enforcement personnel, and the law enforcement personnel thereupon conducted their own investigation. In light of Detective Faulk’s uncontradicted affidavit, “any chain of causation regarding plaintiffs subsequent detention was broken,” because “[t]he decision to detain plaintiff was made by the independent actions and investigation” of Detective Faulk. See Kennedy, 05-1418 at p. 32 n. 20, 935 So.2d at 690 n. 20. Thus, plaintiffs have further failed to show that they can likely prevail as to the issue of causation. See also Mitchell v. Villien, 08-1470, pp. 21-3 (La.App. 4th Cir.8/26/09), 19 So.3d 557, 572-73, writ denied, 09-2111 (La.12/11/09), 23 So.3d 923, and Adams v. Harrah’s Bossier City Inv. Co., L.L.C., 41,468, pp. 5-6 (La.App. 2nd Cir.1/10/07), 948 So.2d 317, 320, writ denied, 07-0639 (La.5/11/07), 955 So.2d 1281. Summary judgment was clearly appropriate on the malicious prosecution claim as well as the defamation claims.

Conclusion

Here, the plaintiffs presented no direct, competent proof of a genuine issue of material fact supporting the existence of bad faith, malice, or reckless disregard for the truth in the privileged statements made on behalf of Jalou II to a law enforcement agency. They have further failed to meet their threshold burden of proof of abuse of the conditional privilege applicable to both Jalou II and Fidelity for those allegations relating to Ms. Grow in their civil petition. Finally, plaintiffs have failed to show that they LrWÍII be able to meet their corresponding burden of proof of the elements of causation, absence of probable cause, and malice for their malicious prosecution claim.
In summary, plaintiffs failed to put forth factual support sufficient to establish that they could probably meet their burden of *1041 proof at trial on essential elements of their defamation and malicious prosecution claims. Based upon our de novo review of the record, it is our conclusion that plaintiffs’ first assignment of error has no merit, and that the trial court did not err in rendering summary judgment in favor of the defendants.
DECREE
The summary judgment in favor of the defendants in reconvention, Jalou II, Inc. and Fidelity and Deposit Company of Maryland, dismissing the reconventional demand of the plaintiffs in reconvention, Debra A. Grow and Randy Grow, is hereby affirmed. All costs of this appeal are assessed to the plaintiffs in reconvention.
AFFIRMED.

. Debra A. Grow is a defendant in the principal action, but occupies the status of plaintiff in the reconventional demand filed by her and her husband against the plaintiffs in the principal action. Because only the dismissal of the reconventional demand is at issue in this *1027 appeal, for convenience we refer to Ms. Grow and her husband as plaintiffs rather than defendants or plaintiffs in reconvention. See La. C.C.P. art. 1040.

. "Kiting” is more commonly associated with the illegal practice of "check-kiting,” or writing a check against a bank account with insufficient funds, in the hope that funds from a previously deposited check will be credited to cover the amount of the outstanding check. See Black’s Law Dictionary 253, 887 (8th ed.2004). "Lapping” is an embezzlement technique involving the use of accounts receivable from a customer, or revenue from a later accounting period, to cover shortages (due to the responsible employee's theft) in accounts receivables from another customer or revenue from an earlier period. See Black’s Law Dictionary 896 (8th ed.2004); Cent. Bucks Sch. Dist. v. Cogan, 719 A.2d 7, 8 (Commw.Ct.Pa.1998); and U.S. v. Crook, 213 Fed.Appx. 754, 756 (10th Cir.2007). See also Ray Gibbins Certified Welders, Inc. v. Griggs, 543 So.2d 68, 70 (La.App. 1st Cir.1989). According to the evidence in the record, the scheme employed by Ms. Liner involved the second variant of "lapping” described above, in which "tomorrow’s funds are used to pay for today’s funds.” See State v. Plunkett, 497 A.2d 725, 727 (R.I.1985).

. Those delays differ substantially from Ms. Grow’s account in her statement and later deposition, in which she expressed her belief that no delay exceeded a week.

. The motion was mistakenly filed in the names of both Jalou II and Fidelity by Jalou II's counsel of record defending the reconven-tional demand. Fidelity later filed its own motion for summary judgment through its own counsel, who had previously filed its separate answer to the reconventional demand.

. The trial court certified the summary judgment as final for purposes of appeal pursuant to La. C.C.P. art. 1915(B), relating to partial judgments and partial summary judgments. A reconventional demand is a “civil action” or suit within the meaning of La. C.C.P. art. 421, even though asserted in response to a principal action. As the summary judgment dismissed plaintiffs' reconventional demand or "suit” against both defendants, and adjudicated “all of the claims, demands, issues, or theories” asserted therein, certification of the judgment as final under La. C.C.P. art. 1915(B) was unnecessary, and the amendment to the original judgment served no actual procedural purpose. See La. C.C.P. art. 1915(A)(3) and (B)(1); La. C.C.P. art. 1911; and Block v. Bernard, Cassisa, Elliott & Davis, 04-1893, p. 7 n. 4 (La.App. 1st Cir. 11/4/05), 927 So.2d 339, 344 n. 4.

. A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes. La. C.C.P. art. 853.

. Because the claimed loss exceeded the coverage limits, the deductible amount did not apply under the policy terms.

. An affirmative defense is generally defined as "[a] defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's ... claim, even if all the allegations in the complaint are true.” Black’s Law Dictionary 451 (8th ed.2004).

. The allegations of plaintiffs’ own petition thus tend to satisfy the first step in establishing the existence of the conditional privilege as a matter of law, by showing the circumstances in which the communications were made. See Smith, 93-2512 at p. 18, 639 So.2d at 745.

. This conclusion accords with the liberal construction to be accorded our procedural articles, “with due regard for the fact that rules of procedure implement the substantive law and are not an end in himselves.’’ La. C.C.P. art. 5051. See also La. C.C.P. art. 865.

. Louisiana Code of Civil Procedure article 967(C) provides:
If it appears from the affidavits of a party opposing the motion that for reasons stated he cannot present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.
(Emphasis added.)

. Our present consideration of the issue of conditional privilege, which has been fully briefed by the parties, also serves the favored goal of judicial economy. See Grant, 00-1227 atp. 4, 785 So.2d at 1043.